IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRIATCT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAWN GOWDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No.  11-cv-1304 |
| CITY OF CHICAGO, et al. ) | Judge Der-Yeghiayan |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Shawn Gowder, by and through counsel, submits the following Memorandum Of Law in Support of his Motion for Summary Judgment pursuant to LR 56.1(a)(2):

As demonstrated by plaintiff's LR 56.1 Statement, there are no material facts in dispute in this case.  It is undisputed that MCC 8-20-110(a) provides that "it is unlawful for any person to carry or possess a firearm without a CFP [Chicago Firearm Permit]," and that defendants denied plaintiff's application for a CFP.  It is undisputed that MCC 8-20-110(b)(3)(iii) provides that a CFP will not be issued to a person who has been "convicted by a court in any jurisdiction of an unlawful use of a weapon that is a firearm;" and that the ordinance does not define the term "use."  It is undisputed that plaintiff has a 1995 misdemeanor conviction for unlawfully carrying or possessing a handgun in a public place pursuant to 720 ILCS 5/24-1(a)(10).  It is further undisputed that this misdemeanor conviction was the sole basis on which the CPD denied plaintiff's application for a CFP; and that the DOAH affirmed the denial of plaintiff's application based upon its construction of the term "use" in MCC § 8-20-110(b)(3)(iii) to include misdemeanor convictions for merely carrying or possessing a firearm, as opposed to actively firing, employing, or operating a firearm.

1

Accordingly, if plaintiff's offense even constituted "use," the sole issue presented by this motion is a pure question of law: whether MCC § 8-20-110(b)(3)(iii), on its face and as applied by defendants, impermissibly infringes on the fundamental right to keep and bear arms under the U.S. and Illinois Constitutions. This case is therefore appropriate for resolution on a motion for summary judgment. *See Flora v. Home Federal Savings and Loan Ass'n.*, 685 F.2d 209, 211 (7th Cir. 1982).

**I.    FRAMEWORK FOR REVIEW.**

The Seventh Circuit's decision in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), governs this Court's review of Gowder's Second Amendment claim.[1] In *Ezell*, the Seventh Circuit ordered entry of a preliminary injunction against enforcement of another provision of the City of Chicago's firearms ordinance, a now-repealed provision that banned firing ranges in the city. In reaching this decision, the court established a two-step framework for reviewing Second Amendment claims. The first step is a "threshold inquiry" into whether "the restricted activity [is] protected by the Second Amendment." *Id.* at 701. The "answer requires a textual and historical inquiry into original meaning," *id.*, and the government bears the burden conclusively to "establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment," *id.* at 702-03.[2] If the government can do so, "the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.* at 703.

---

[1] As noted below, certain aspects of *Ezell*'s framework may be inconsistent with *Heller* and *McDonald*. Because *Ezell* governs here, plaintiff will not belabor these points but reserves the right to advance such arguments on appeal. At any rate, Chicago's ban cannot survive *Ezell*.

[2] *Ezell* states that the "relevant historical moment" for this original-meaning inquiry is "1791 or 1868," depending upon whether a Federal or State or local law is under review. 651 F.3d at 702-03. But *McDonald* makes clear "that the Second Amendment right is *fully applicable* to the States," *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026 (2010) (emphasis added), and that right is "enshrined with the scope [it was] understood to have when the people adopted [it]" in 1791, *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).

But if the government cannot make such a showing, the court proceeds to "evaluate the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id.* For "broadly prohibitory laws restricting the core Second Amendment right," this analysis is a simple one, for "[b]oth *Heller* and *McDonald* suggest that" such laws "are categorically unconstitutional." *Id.* "For all other cases, however, [a court is] left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights," including strict scrutiny. *Id.* The "general principles" for choosing an appropriate standard of review are:

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified.

*Id.* at 708.[3]

Chicago severely burdens the core Second Amendment rights of individuals convicted of a misdemeanor unlawful use of weapons offense by forever banning them from possessing firearms. Under *Heller*, *McDonald*, and *Ezell* this ban is categorically unconstitutional, or, at a minimum, subject to strict scrutiny. Either way, it is unconstitutional.

## II. CHICAGO'S BAN STRIKES AT THE HEART OF GOWDER'S SECOND AMENDMENT RIGHTS.

Starting with *Ezell*'s "threshold inquiry," Chicago's ban plainly "restrict[s] activity protected by the Second Amendment." 651 F.3d at 701. The ban prohibits anyone who has been convicted of "an unlawful use of a weapon that is a firearm" from obtaining a CFP, MCC § 8-20-

---

[3] *Ezell* cannot be squared with *Heller* and *McDonald* to the extent it suggests that the government, by some sort of means-ends showing, may justify a restriction of the Second Amendment's historically understood scope. *See, e.g.*, *Heller*, 554 U.S. at 635; *McDonald*, 130 S. Ct. at 3050 (plurality); *Heller v. District of Columbia*, __ F.3d __, 2011 WL 4551558, at *22-*35 (D.C. Cir. Oct. 4, 2011) (Kavanaugh, J., dissenting).

110(b)(3)(iii), and without a CFP "it is unlawful for any person to carry or possess a firearm," MCC § 8-20-110(a). In other words, the ban literally forbids those to whom it applies from *ever* exercising their fundamental right to keep ("possess") and bear ("carry") firearms, whether for self-defense in the home, hunting, or any other lawful purpose.

Chicago is thus left with one avenue for showing that its ban falls outside the scope of the Second Amendment: that the *persons* to whom it applies have somehow forfeited their Second Amendment rights. *See District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("*Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home.") (emphasis added). And this it cannot do, at least to the extent the ban applies to nonviolent misdemeanants like Gowder.

The Supreme Court, to be sure, has stated that there are "historical justifications" supporting "longstanding prohibitions on the possession of firearms by *felons*," *Heller*, 554 U.S. at 626, 635 (emphasis added), and thus that such measures are "presumptively lawful," *id.* at 627 n.26; *see also McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010) (plurality). By singling out *felons*, however, this statement if anything cuts against a finding that misdemeanants lack Second Amendment rights. Indeed, historical sources indicate that it is the demonstrated threat of violence that disqualifies a person from exercising Second Amendment rights. *See, e.g., The Address and Reasons of Dissent of the Pennsylvania Minority of the Convention of the State of Pennsylvania and their Constituents* (1787), *reprinted in* 2 B. SCHWARTZ, THE BILL OF RIGHTS 665 (1971) ("no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury* from individuals.") (emphasis added); Journal of Convention: Wednesday, February 6, 1788, *reprinted in* DEBATES AND PROCEEDINGS IN THE

4

CONVENTION OF THE COMMONWEALTH OF MASSACHUSETTS 86 (1856) (proposal by Samuel Adams that "the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms") (emphasis added). Furthermore, the common-sense distinction society has long drawn between felons and other citizens for purposes of exercising constitutional rights, *see, e.g.*, *Richardson v. Ramirez*, 418 U.S. 24 (1974) (rejecting constitutional challenge to felon disenfranchisement law), does not extend to misdemeanants, particularly nonviolent ones, *see* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 U.C.L.A. L. REV. 1443, 1498 (2009) ("If felon bans are upheld on the grounds that felons have historically been seen as outside the scope of various constitutional rights, then felon bans would offer a poor analogy for bans on possession by misdemeanants."). There is no evidence that Gowder presents any threat of violence.

*Skoien* is not to the contrary. There, the Seventh Circuit rejected a Second Amendment challenge to the federal ban on firearm possession by persons who have been convicted of "a misdemeanor crime of domestic violence." 18 U.S.C. § 922(g)(9). But *Skoien* did not purport to authorize firearms restrictions against *all* misdemeanants, nor did it imply that any such restrictions would be consistent with the Second Amendment's original meaning. To the contrary, in affirming the constitutionality of Section 922(g)(9), the court emphasized that a "misdemeanor crime of domestic violence … is one in which *violence* (actual or attempted) *is an element of the offense*." *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc) (emphasis added, quotation marks omitted); *see also id.* ("The belief underpinning § 922(g)(9) is that people who have been convicted of violence once . . . are likely to use violence again."). Chicago's ban plainly is not predicated on any such finding; indeed, as a practical matter the ban impacts *only*

5

nonviolent offenders, for the City's ordinance separately bars anyone "convicted . . . of . . . a violent crime" from obtaining a CFP. MCC § 8-20-110(b)(3)(i).

As applied to Gowder, there is an even more fundamental problem with Chicago's ban: the Illinois law he was convicted of violating makes it unlawful simply to carry an operable firearm in public within any city, village, or incorporated town in the State. *See* 720 ILCS 5/24-1(a)(10). The constitutionality of this law is doubtful, to put it mildly, for the right to bear arms protected by the Second Amendment "*guarantee[s] the individual right to . . . carry weapons in case of confrontation.*" *Heller*, 554 U.S. at 592 (emphasis added).[4] And while this right is not "unlimited," *id.* at 626, the very carriage limits the Supreme Court has identified as potentially valid—limits on the manner in which arms may be borne and limits on carrying them in particularly "sensitive places," *id.*—militate strongly *against* the validity of Illinois's law broadly prohibiting carrying firearms in public. *See also id.* at 629 ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional") (quoting *State v. Reid*, 1 Ala. 612, 616-17 (1840)).

But even putting to one side the *constitutionality* of Illinois's public carriage ban, it is simply implausible to suggest that the people who adopted the Second Amendment or the Fourteenth Amendment would have understood the simple act of carrying a firearm in public to *forfeit* one's fundamental right to keep and bear arms. Indeed, the practice of carrying firearms was common and widespread at the founding. As Judge St. George Tucker observed, "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without

---

[4] Illinois is the only State in the Nation that makes it a crime to carry firearms in public without also providing a permit or license authorizing some form of lawful public carriage. *See* Doc. No. 27-1. At least two constitutional challenges to Illinois's carriage ban are pending in federal court. *See Shepard v. Madigan*, No. 3:11-cv-00405-WDS-PMF (S.D. Ill.); *Moore v. Madigan*, No. 12-1269 (7th Cir.).

his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 BLACKSTONE COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803).[5] And the generation that adopted the 14h Amendment sought to ensure that the right to carry firearms was enjoyed equally by *all* Americans. *See, e.g.*, Ex. Doc. No. 70, House of Representatives, 39th Cong., 1st Sess., at 297 (1866) ("There must be 'no distinction of color' in the right to carry arms, any more than in any other right."). In light of this history, it would be untenable to hold that Gowder forfeited his Second Amendment rights simply by carrying a firearm in public.

### III. CHICAGO'S BAN IS UNCONSTITUTIONAL.

#### A. Strict Scrutiny Applies.

As the foregoing analysis demonstrates, Chicago's ban is a "broadly prohibitory law[] restricting the core Second Amendment right" and is thus "categorically unconstitutional"—period. *Ezell*, 651 F.3d at 703. Indeed, Chicago's ban is even more "prohibitory" than the bans struck down in *Heller* and *McDonald*, for it is not limited to handguns but applies to all firearms.

But even if a levels-of-scrutiny analysis is applied, because Chicago's ban imposes "a severe burden on the core Second Amendment right of armed self-defense," only "an extremely strong public-interest justification and a close fit between the government's means and its end" could sustain it. *Id.* at 708. The ban, in other words, must satisfy strict scrutiny. Anything less would improperly "single[] out" the core right of armed self-defense protected by the Second Amendment for "specially unfavorable . . . treatment," *McDonald*, 130 S. Ct. at 3043, for *Heller*

---

[5] George Washington carried a pistol for self-defense and is said to have drawn one to fend off a "desperado" who threatened to shoot him on his ride from Mt. Vernon to Alexandria shortly after the Revolutionary War. BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES 95 (Washington, D.C., 1872). John Adams brought a pistol with him when he sailed to France in 1778. *See* DAVID MCCULLOUGH, JOHN ADAMS 177 (2001). And Thomas Jefferson wrote his nephew, "Let your gun therefore be the constant companion of your walks." THOMAS JEFFERSON, WRITINGS 816–17 (letter of August 19, 1785) (Merrill D. Peterson ed., 1984).

and *McDonald* confirm that "the right to keep and bear arms is fundamental to *our* scheme of ordered liberty," *id.* at 3036 (opinion of the Court). And it is well-established that "strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983).

Chicago will undoubtedly argue that *Skoien* points to a different result. That case, to be sure, applied intermediate scrutiny to the federal government's "categorical limit on the possession of firearms" by persons who have been convicted of a misdemeanor crime of domestic violence. *Skoien*, 614 F.3d at 641. But *Skoien* did not purport to settle the standard of review applicable to *all* categorical limits on the possession of firearms; indeed, the Court expressly declined to delve "more deeply into the 'levels of scrutiny' quagmire" than necessary to decide the case before it. *Id.* at 642; *see also United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2011) ("In *Skoien* we declined to adopt a level of scrutiny applicable to every disarmament challenge."). Given the limited application of the federal government's ban to violent criminals, the activity restricted in *Skoien* plainly was "closer to the margins of the Second Amendment right" than the activity restricted here. *Ezell*, 651 F.3d at 708. And the "burden" imposed in *Skoien* was also more "modest," for under the federal law "expungement, pardon, or restoration of civil rights" would remove the ban's application. *Skoien*, 614 F.3d at 644 (citing 18 U.S.C. § 921(a)(33)(B)(ii)). Chicago's law contains no such provision.

The facts of *Skoien* bring the contrast between that case and this one into an even starker light. Not only was Steven Skoien convicted of a violent crime, but he was a "recidivist, having been convicted twice of domestic battery. . . . And Skoien was arrested for possessing multiple guns just one year after that second conviction." *Id.* at 645. Indeed, *Skoien* emphasized that the question of "[w]hether a [domestic violence] misdemeanant who has been law abiding for an ex-

tended period must be allowed to carry guns" was not before the court. *Id.* Gowder, by contrast, plainly "has been law abiding for an extended period." His sole, non-violent conviction was entered nearly 17 years ago, and he, unlike Skoien, is here in a civil pre-enforcement challenge, not in defense against criminal charges.

For these reasons, the firearms disability in *Skoien* could be "more easily justified" than the "severe burden on the core Second Amendment right of armed self-defense" at issue here, *Ezell*, 651 F.3d at 708, a burden that must at a minimum be subject to strict judicial scrutiny.

### B. Chicago's Ban Cannot Pass Any Form Of Heightened Scrutiny.

Because Chicago cannot demonstrate that its law is "necessary to promote a compelling government interest," *Dunn v. Blumstein*, 405 U.S. 330, 342 (1972), the City cannot satisfy strict scrutiny. Indeed, Chicago cannot meet *any* form of heightened scrutiny. Under even intermediate scrutiny, Chicago bears the burden of proof, and the burden is a substantial one. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (applying intermediate scrutiny; "the burden of justification is demanding and it rests entirely on the State"). Intermediate scrutiny requires a "strong showing" by the government that a law is "substantially related to an important governmental objective," *Skoien*, 614 F.3d at 641, and the government must "supply actual, reliable evidence to justify" to make this showing, *Ezell*, 651 F.3d at 709. Chicago cannot meet this burden of proof.

#### 1. The ordinance does not apply to plaintiff.

Pursuant to well-established canons of statutory construction, the ordinance cannot apply to plaintiff in the first instance because he was convicted only of carrying or possessing a firearm in public. Carrying and possessing do not constitute "use" within the meaning of the ordinance.

9

The legal distinction between "carry or possess" and "use" is recognized in MCC 8-20-110 itself, which provides in part:

(a) . . . it is unlawful for any person to *carry or possess* a firearm without a CFP.

(b) No CFP application shall be approved unless the applicant: . . .

 (3) has not been convicted by a court in any jurisdiction of: . . .

 (iii) an unlawful *use* of a weapon that is a firearm . . . . (Emphasis added.)[6]

Since the above refers to having been "convicted by a court *in any jurisdiction*" of the "unlawful use" of a firearm, the term "use" refers to its ordinary meaning in jurisdictions generally, not an uncommon meaning by a single jurisdiction.[7] No special definition is set forth in MCC 8-20-010, "Definitions." A reference is made there to the Illinois Firearms Owners Identification Card Act, 430 ILCS 65/1 *et seq.*, but not in connection with the issue here.

The conviction here is for a violation of 720 ILCS 5/24-1(a)(10), which has the following uncommon meaning of "use":

 A person commits the offense of unlawful use of weapons when he knowingly: . . .

 (10) Carries or possesses on or about his person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, . . . any pistol, revolver, stun gun or taser or other firearm . . . .

Other jurisdictions – including the United States, other States, and Illinois municipalities – do not equate the mere carrying or possession of a firearm with the "use" thereof. For instance,

---

[6] *See also* MCC 8-20-202(a) ("It is unlawful for any person to carry or possess a handgun, except when in the person's home.").

[7] "Because it is undefined, this statutory term must be given its plain and ordinary meaning." *Village of Northfield v. BP America, Inc.*, 403 Ill. App.3d 55, 61, 933 N.E.2d 413 (Ill. App. 2010). "The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. . . . When the statute contains undefined terms, it is entirely appropriate to employ a dictionary to ascertain the plain and ordinary meaning of those terms." *People v. Davison*, 233 Ill.2d 30, 40, 329 Ill. Dec. 347, 906 N.E.2d 545 (2009).

the federal Gun Control Act penalizes "possession" in some contexts, and "use" in others. *Compare* 18 U.S.C. § 922(g) ("possession" of firearm by certain persons) *with* § 924(c) ("use" of firearm during drug trafficking or crime of violence). *Bailey v. United States*, 516 U.S. 137, 143 (1995), held about the latter that "'use' signifies active employment of a firearm. . . . We . . . hold that § 924(c)(1) requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense."[8] "We agree . . . that 'use' must connote more than mere possession of a firearm . . . ." *Id. See also id.* at 146 ("a firearm can be carried without being used").

The term "use" in MCC 8-20-110 must be given its ordinary meaning, which would be, as explained in *Bailey*, *id.* at 145:

> The word "use" in the statute must be given its "ordinary or natural" meaning, a meaning variously defined as "[t]o convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of." . . . (citing Webster's New International Dictionary of English Language 2806 (2d ed. 1949) and Black's Law Dictionary 1541 (6th ed. 1990)).

Unless construed with its ordinary meaning, MCC 8-20-110 would allow a person with a conviction for mere possession or carrying of a firearm in any jurisdiction in the United States, other than Illinois, to be issued a CFP. The lone exception would be a person convicted under 720 ILCS 5/24-1(a)(10)1. "Statutes must be construed to avoid absurd results." *Jones v. Nissan North America, Inc.*, 385 Ill. App.3d 740, 751, 895 N.E.2d 303 (2008). Moreover, the provision must be interpreted according to ordinary usage to avoid the constitutional issue of whether the

---

[8] "The active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm." *Id.* at 148.

11

resulting ban on possession of a firearm by the applicant would violate the Second and Fourteenth Amendments to the U.S. Constitution, and Article I, § 22, of the Illinois Constitution.[9]

Defendants' construction of the ordinance to encompass misdemeanor convictions for use or possession, and their application of this construction to deny plaintiff's CFP application, impermissibly infringes on plaintiff's right to keep and bear arms under Amends. II and XIV, U.S. Const., and Art. I, § 22, Ill. Const.[10] Plaintiff may lawfully possess firearms under the laws of the United States and Illinois. He has a FOID card issued pursuant to the Illinois Firearms Owners Identification Card Act, 430 ILCS 65/1 *et seq*., and thus is not among the "persons who are not qualified to acquire or possess firearms . . . within the State of Illinois . . . ." *Id*. § 1. He is entitled to the FOID card because "[h]e . . . has not been convicted of a felony under the laws of this or any other jurisdiction . . . ." *Id*. § 4(a)(2)(ii).

Because plaintiff was not convicted of an unlawful "use" of a weapon as that term is interpreted by the Supreme Court and common usage, MCC § 8-20-110(b)(3)(iii) does not apply to him.

### 2. Defendants cannot meet their burden of proof to establish the constitutionality of the ordinance.

If MCC § 8-20-110(b)(3)(iii) does apply to plaintiff, it must be struck down. Despite being given a full and fair opportunity by the Court to do so, defendants have not developed an evidentiary record to support the categorical ban of MCC § 8-20-110(b)(3)(iii), let alone meet their heavy burden to demonstrate its constitutionality. As an initial matter, Chicago has not produced *any* competent evidence in this case to support its categorical ban on misdemeanants' right to

---

[9] The canon of constitutional avoidance requires the Court to choose the construction of the ordinance that avoids raising substantial doubts as to its constitutionality. *Clark v. Martinez*, 543 U.S. 371, 385 (2005); *Villegas v. Board of Fire & Police Comms.*, 167 Ill. 2d 108, 124, 656 N.E.2d 1074 (1995).

[10] Plaintiff hereby adopts and incorporates by reference pursuant to FRCP 7(b)(2) and 10(c) the arguments regarding the unconstitutionality of the ordinance under Art. I, § 22 of the Illinois Constitution set forth in his previously filed memorandum in support of his motion for judgment on the pleadings [Doc. # 27].

12

keep and bear arms. As the Court will recall, on June 21, 2011, plaintiff filed his motion for judgment on the pleadings [Doc. #26], and also filed a motion for protective order to stay or bar discovery pending a ruling on that motion [Doc. #24]. On June 28, 2012, the Court granted plaintiff's motion for protective order and stayed discovery pending disposition of plaintiff's motion for judgment on the pleadings. [Doc. #29]. After briefing was completed, the Court held a status hearing on October 19, 2011, at which time it advised the parties that it did not wish to rule upon the constitutional questions before it based solely upon the pleadings; rather, the Court wanted to allow the defendants an opportunity to create an evidentiary record in support of the challenged ordinance, and then rule upon plaintiff's constitutional challenge in the context of a summary judgment motion. The Court therefore struck the motion for judgment on the pleadings without prejudice, allowed the defendants an opportunity to conduct discovery, and ordered all discovery to be completed by January 20, 2012 [Doc. #33].

Defendants conducted absolutely no discovery following the Court's order. They issued no interrogatories or document requests, took no depositions, and disclosed no witnesses or experts pursuant to FRCP 26(a)(1) or (2) who would testify to any purported governmental interests served or the manner in which they are served by MCC § 8-20-110(b)(3)(iii). Indeed, defendants did not disclose the names of *any* individuals likely to have discoverable information in this regard. The only disclosure made by defendants in this case was their initial disclosure pursuant to FRCP 26(a)(1), attached to plaintiff's LR 56.1(a)(3) Statement as Exhibit A. That disclosure states only, "Individuals with knowledge of the governmental purposes served by MCC § 8-20-110. Investigation continues."

FRCP 26(a)(1)(A) requires that a party must, without awaiting a discovery request, provide to the other parties "the name and, if known, the address and telephone number of each in-

dividual likely to have discoverable information that the disclosing party may use to support its claims or defenses. . . ." FRCP 26(a)(2) requires that a party must disclose the identity of any person who may be used at trial to present evidence under Rules 702, 703 or 705 of the Federal Rules of Evidence. Defendants have not complied with either Rule 26(a)(1)(A) or Rule 26(a)(2), despite ample time to do so, and they have no justifiable reason for not complying in view of the Court's order requiring discovery to be completed by January 20, 2012. Pursuant to FRCP 37(c)(1), therefore, defendants are not now permitted to present any affidavits, testimony, reports or other evidence from any undisclosed witnesses in opposition to the present motion. *Musser v. Gentiva Health Services*, 356 F.3d 751, 758 (7th Cir. 2004) (The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless).

Furthermore, in briefing to date the City has identified just a single study that purports to analyze the future criminality of nonviolent firearm offenders who obtain firearms. *See* Doc. #30 at 15 (citing Garen Wintemute, *et al.*, *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 J. Am. Med Ass'n 2083 (Dec. 1998)). That study has little bearing here. Looking at 1977 purchases of firearms from federally licensed dealers in California, the study found that individuals who "had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but not violent offenses, were at increased risk for later violent offenses." *Id*. The study does not, however, compare nonviolent offenders who purchased a firearm with nonviolent offenders who *did not* purchase a firearm, so it does not speak to whether public safety would be enhanced by restricting nonviolent offenders' firearms possession. The study also does not account for the public safety *costs* of disarming nonviolent offenders. *See* GARY KLECK &

14

DON B. KATES, ARMED 222 (2001) ("each year in the United States there are about 2.2 to 2.5 million defensive uses of guns of all types by civilians against humans"); CHARLES F. WELLFORD, JOHN V. PEPPER & CAROL V. PETRIE (eds.), FIREARMS AND VIOLENCE: A CRITICAL REVIEW 103 (2004) ("At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses."). And the study tells us nothing in particular about individuals like Mr. Gowder who have been law abiding for many years following a single nonviolent offense, because it lumps together all nonviolent offenders without regard to when each committed his offense.[11] In sum, this study plainly does not establish that Chicago's ban is justified by public safety concerns.[12]

For the reasons stated, plaintiff respectfully prays that the Court enter summary judgment in his favor, as set forth in his Motion for Summary Judgment, and grant such other relief as may be appropriate.

Respectfully submitted,

s/<u>Stephen A. Kolodziej</u>
Stephen A. Kolodziej
Ford & Britton, P.C.
33 North Dearborn Street, Suite 300
Chicago, Illinois 600602
(312) 924-7508
*Attorney for Plaintiff Shawn Gowder*

---

[11] In discovery, Chicago identified another study that analyzed the likelihood of criminal behavior by firearms purchasers with nonviolent misdemeanor convictions. *See* Mona A. Wright & Garen J. Wintemute, *Felonious or Violent Criminal Activity that Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors*, J. Trauma, Injury, Infection & Critical Care (2010), *at* http://www.ucdmc.ucdavis.edu/vprp/pdf/IneligibilityJTrauma.pdf. Not only is that study subject to the same criticisms as *Prior Misdemeanor Convictions*, but unlike *Prior Misdemeanor Convictions* it does not place particular focus on individuals convicted of nonviolent firearms-related offenses.

[12] The study's results are also skewed by the *exclusion* of everyone who had been arrested but not convicted from the control group of persons without a criminal record. *See* Wintemute *et al.*, *Prior Misdemeanor Convictions*, *supra*, at 2084-85; *see also* Wright & Wintemute, *Felonious or Violent Criminal Activity*, *supra*, at 6, Table 4 (finding that firearms purchasers with a prior arrest, but no prior convictions, committed more violent crimes than firearms purchasers with a single prior misdemeanor conviction).

**CERTIFICATE OF SERVICE**

I, Stephen A. Kolodziej, an attorney, hereby certify that on March 19, 2012, service of the foregoing Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment is being made in accordance with the General Order on Electronic Case Filing section XI to the following:

>Rebecca Alfert Hirsch
>Andrew W. Worseck
>Assistant Corporation Counsel
>30 N. LaSalle Street, Suite 1230
>Chicago, IL 60602

>s/ Stephen A. Kolodziej
>Stephen A. Kolodziej
>Ford & Britton, P.C.
>33 N. Dearborn, Suite 300
>Chicago, Illinois 60602
>(312) 924-7508
>skolodziej@fordbritton.com