## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **SHAWN GOWDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 1304** |
| | ) | |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff Shawn Gowder's (Gowder) motion for summary judgment. Gowder challenges Section 8-20-110(b)(3)(iii) of the Municipal Code of Chicago, hereinafter referred to as Section (b)(3)(iii) of the Chicago Firearm Ordinance. For the reasons stated below, the motion for summary judgment is granted. This court finds that Section (b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutionally void for vagueness. In addition, this court finds that Section (b)(3)(iii) of the Chicago Firearm Ordinance violates Gowder's right to keep and bear arms under the Second Amendment of the United States Constitution.

## BACKGROUND

On August 21, 1995, Gowder was convicted in Illinois of the offense of unlawful use of a weapon under 720 ILCS 5/24-1(a)(10) based upon his possession of a weapon, and Gowder was sentenced to twelve months probation. At the time of Gowder's conviction, a violation of 720 ILCS 5/24-1(a)(10) was unconstitutionally classified as a Class 4 Felony. In 1999, the Illinois Supreme Court in *People v. Cervantes*, 723 N.E.2d 265, 267 (Ill. 1999), struck down the Safe Neighborhood Act, also known as Public Act 88-680, which had classified simple possession of a firearm as a felony. The Illinois Supreme Court found the Safe Neighborhood Act unconstitutional, and therefore Gowder's conviction for first time possession of a firearm was considered a misdemeanor under 720 ILCS 5/24-1(b) by operation of law. *Id.; see also People v. Lindsey*, 753 N.E.2d 1270, 1278 (Ill. App. Ct. 2001)(mandating reduction from a felony to a misdemeanor). Pursuant to the decision in *Lindsey*, on April 21, 2003, the Circuit Court of Cook County entered an order reducing Gowder's conviction for "unlawful use of a weapon" from a felony to a misdemeanor.

The City of Chicago requires persons living within the city limits of Chicago to obtain a Chicago Firearm Permit in order to possess firearms in their homes. Chicago Municipal Code 8-20-110(a). In 2010, Gowder applied for a Chicago Firearm Permit (Application). The City of Chicago denied the Application, citing Section (b)(3)(iii) of the Chicago Firearm Ordinance, which provides that "[n]o [Chicago Firearm Permit] application shall be approved unless the applicant . . . has

not been convicted by a court in any jurisdiction of . . . an unlawful use of a weapon that is a firearm." Chicago Municipal Code 8-20-110(b)(3)(iii). Gowder appealed the denial of the Application to the City of Chicago Department of Administrative Hearings, and the administrative law judge affirmed the denial of the Application on December 8, 2010. The court notes that, interestingly, Gowder was issued an Illinois Firearm Owner's Identification (FOID) card pursuant to 430 ILCS 65/1 *et seq.*, and thus Gowder is not among the "persons who are not qualified to acquire or possess firearms . . . within the State of Illinois. . . ." *Id.* Gowder is entitled to a FOID card under the laws of the State of Illinois because "[h]e . . . has not been convicted of a felony. . . ." 430 ILCS 65/4(a)(2)(ii).

Gowder subsequently brought the instant action, and includes in his amended complaint a claim seeking judicial review of an administrative decision under the Illinois Administrative Review Law, 735 ILCS 5/3-101 *et seq.* (Count I), a declaratory and injunctive relief claim seeking a declaration that Section (b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutional under the United States Constitution (Count II), and a declaratory and injunctive relief claim seeking a declaration that Section (b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutional under the Illinois Constitution (Count III). Gowder has now filed a motion for summary judgment on all counts. The Illinois State Rifle Association has filed an amicus brief in this matter.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most

3

favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope School,* 560 F.3d 694, 699 (7th Cir. 2009). A "genuine issue" of material fact in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).


## DISCUSSION

The City of Chicago's ordinance regarding Permits for and Registration of Firearms has triggered this lawsuit. While other provisions of the Chicago Firearm Ordinance may be subject to and may not survive constitutional challenge, this court addresses only the constitutionality of Section (b)(3)(iii) of the Chicago Firearm Ordinance, which bars individuals convicted of even non-violent misdemeanor offenses from possessing firearms in their homes for self-defense. Gowder, in the first instance, challenges the language in Section (b)(3)(iii) of the Chicago Firearm Ordinance, basically arguing that the language is vague. In addition, Gowder argues

that Section (b)(3)(iii) of the Chicago Firearm Ordinance, which bars Gowder from

obtaining a Chicago Firearm Permit based on his status as a non-violent

misdemeanant, violates his constitutional right to keep and bear arms under the

Second Amendment of the United States Constitution.


I.  Unconstitutionally Void For Vagueness

The first question this court addresses is whether the language of Section

(b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutionally vague.  Section

(b)(3)(iii) of the Chicago Firearm Ordinance provides that "[n]o [Chicago Firearm

Permit] application shall be approved unless the applicant . . . has not been convicted

by a court in any jurisdiction of . . . an unlawful use of a weapon that is a firearm."

Chicago Municipal Code 8-20-110(b)(3)(iii).  Gowder, in essence, argues that

Section (b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutionally vague

because it does not define the term "unlawful use of a weapon."  An ordinance may

be found to be unconstitutionally vague if (1) the ordinance "does not provide a

person of ordinary intelligence a reasonable opportunity to know what is prohibited,"

or (2) the ordinance "fails to provide explicit standards to prevent arbitrary and

discriminatory enforcement by those enforcing the [ordinance]."  *United States v.

Lim*, 444 F.3d 910, 915 (7th Cir. 2006); *see also Papachristou v. City of

Jacksonville*, 405 U.S. 156, 162 (1972)(indicating that an ordinance is

unconstitutionally vague if it "fails to give a person of ordinary intelligence fair

notice that his contemplated conduct is forbidden by the statute, . . . and because it

encourages arbitrary and erratic arrests and convictions")(citation omitted)(internal quotations omitted); *Skilling v. United States*, 130 S.Ct. 2896, 2927-28 (2010)(stating that "[t]o satisfy due process, a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement")(quoting in part *Kolender v. Lawson,* 461 U.S. 352, 357 (1983))(and stating that "[t]he void-for-vagueness doctrine embraces these requirements"); *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012)(stating that a statute is unconstitutionally vague "'if it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner'")(quoting *Fuller ex rel. Fuller v. Decatur Public School Bd. of Educ. Sch. Dist. 61,* 251 F.3d 662, 666 (7th Cir. 2001)).

Section (b)(3)(iii) of the Chicago Firearm Ordinance bars a person from obtaining a Chicago Firearm Permit if that person has been convicted "in any jurisdiction" of an "unlawful use of a weapon that is a firearm." Chicago Municipal Code 8-20-110(b)(3)(iii). In this case, the court first looks to see if Section (b)(3)(iii) of the Chicago Firearm Ordinance implicates constitutionally protected conduct. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982)(stating that "[i]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct" and if it does "[t]he court should then

6

examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications"). In the instant case, the first inquiry under *Hoffman Estates* is satisfied, in that Section (b)(3)(iii) of the Chicago Firearm Ordinance takes away Gowder's constitutional right to possess a firearm in his own home for self-defense. Thus, the only further inquiry under *Hoffman Estates* is to examine the facial vagueness challenge to the ordinance.

Section (b)(3)(iii) of the Chicago Firearm Ordinance does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, in that it does not define the term "unlawful use of a weapon."[1] It appears that the City of Chicago merely borrowed from an Illinois criminal statute the term "unlawful use of a weapon," which sounds extremely serious on its face, but in reality can include simple unlawful possession. A person of ordinary intelligence, such as Gowder, would not clearly understand who is barred from obtaining a Chicago Firearm Permit under Section (b)(3)(iii) of the Chicago Firearm Ordinance. A person of ordinary intelligence would understand or interpret the term "unlawful use of a weapon that is a firearm" to mean using a firearm for an unlawful purpose, and not mere unlawful possession. In fact, under the plain and ordinary meaning of the term "use," the phrase "unlawful use of a weapon" would not connote possession. Since the term "unlawful use of a weapon" is not defined in the Chicago Municipal Code, "this

---

[1] As stated by Socrates: "The beginning of wisdom is a definition of terms."

statutory term must be given its plain and ordinary meaning." *Village of Northfield v. BP America, Inc.*, 933 N.E.2d 413, 419 (Ill. App. Ct. 2010); *see also Cleveland v. United States*, 531 U.S. 12, 25 (2000)(indicating that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity")(quoting *Rewis v. United States,* 401 U.S. 808, 812 (1971)). Thus, under the language of Section (b)(3)(iii) of the Chicago Firearm Ordinance, a person of ordinary intelligence would not know that mere unlawful possession of a firearm would forever preclude him from obtaining a Chicago Firearm Permit, thus barring him from exercising his Second Amendment constitutional right.

In addition, Section (b)(3)(iii) of the Chicago Firearm Ordinance fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the ordinance, since some administrative law judges might find that unlawful use of a weapon includes unlawful possession, and others may find that it does not. Such a result is especially likely since different jurisdictions define the offense of "unlawful use of a weapon" to mean different things. For example, the offense of "unlawful use of a weapon" in the state of Illinois includes mere possession of a firearm, without any intent or attempt to use a firearm against another, in that Illinois law prohibits a person from "[c]arr[ying] or possess[ing] on or about his person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town . . . any pistol, revolver, stun gun or taser or other firearm." 720 ILCS 5/24-1(a)(10). In contrast, the offense of

"unlawful use of a weapon" in the state of Oregon does not include mere possession, but prohibits "carr[ying] or possess[ing] with intent to use unlawfully against another, any dangerous or deadly weapon. . . ."  O.R.S. § 166.220(1)(a).  In addition, other states' statutes that prohibit possession or carrying of a weapon, such as New Jersey and Massachusetts, are not titled "unlawful use of a weapon," leaving room for individual interpretations as to whether a conviction for mere possession in another jurisdiction would constitute a conviction for "unlawful use of a weapon," as that undefined term appears in Section (b)(3)(iii) of the Chicago Firearm Ordinance. *See, e.g.*, N.J.S.A. 2C:39-5; M.G.L.A. 269 § 10.  Further, cities and municipalities may have their own different definitions of the offense of "unlawful use of a weapon" that do not include mere possession, but include "intent to use" or "use of" a weapon against another individual.  *See, e.g.*, Lenexa City (Kansas) Code, Article 3-9-I-1 (defining the offense of unlawful use of a weapon as including "possessing with intent to use the [weapon] unlawfully against another").  Since different jurisdictions define the offense of "unlawful use of a weapon" differently, Section (b)(3)(iii) of the Chicago Firearm Ordinance does not provide explicit guidelines "to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *Lim*, 444 F.3d at 915.  Therefore, based on the above, this court finds that Section (b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutionally void for vagueness.

## II. Constitutionality of the Ordinance under the Second Amendment

Generally, once the court finds an ordinance unconstitutionally vague, the court need not consider whether the ordinance withstands Second Amendment scrutiny. *See, e.g., Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S.Ct. 1324, 1339 (2010). However, in the instant case, even if Section (b)(3)(iii) of the Chicago Firearm Ordinance is not unconstitutionally vague or was somehow applied properly to Gowder, since Gowder also challenges the constitutionality of the ordinance on Second Amendment grounds, the court will consider whether the ordinance is constitutional under the Second Amendment.

### A. Historical Overview of the Ordinance

On June 26, 2008, in *District of Columbia v. Heller*, 554 U.S. 570 (2008) (*Heller I*), the Supreme Court of the United States held that a "ban on handgun possession in the home violates the Second Amendment, as does [the] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id*. at 635. On June 28, 2010, in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), the Supreme Court held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller [I]*," and that the Second Amendment right to keep and bear arms is therefore "fully applicable to the States." *Id.* at 3026, 3050. On July 2, 2010, subsequent to the Supreme Court's decision in *McDonald*, the City of Chicago

amended the Chicago Municipal Code as it pertains to firearms.

Section 8-20-110 of the Chicago Municipal Code, in relevant part, makes it unlawful for any person to possess a firearm without a Chicago Firearm Permit. Chicago Municipal Code 8-20-110. The Chicago Firearm Ordinance also provides, in relevant part, that "[n]o [Chicago Firearm Permit] application shall be approved unless the applicant . . . has not been convicted by a court in any jurisdiction of . . . an unlawful use of a weapon that is a firearm." Chicago Municipal Code 8-20-110(b)(3)(iii). For the purposes of this action, and under the facts of this case, the Chicago Firearm Ordinance basically provides that anyone convicted of a non-violent misdemeanor offense relating to a firearm is forever barred from exercising his constitutional right to possess a firearm in his own home for self-defense. In Count II, the court is presented with a question of first impression as to whether the City of Chicago can bar a person who has been convicted of a non-violent misdemeanor offense from exercising his Second Amendment constitutional right. Gowder argues that Section (b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutional under the Second Amendment. The City of Chicago argues that Section (b)(3)(iii) of the Chicago Firearm Ordinance is constitutional.


B.  Second Amendment Right to Bear Arms

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be

infringed." U.S. Const. amend. II. This court begins its analysis on the
constitutionality of Section (b)(3)(iii) of the Chicago Firearm Ordinance by
observing that in *Heller I*, Justice Scalia stated: "Undoubtedly some think that the
Second Amendment is outmoded in a society where our standing army is the pride of
our Nation, where well-trained police forces provide personal security, and where
gun violence is a serious problem. That is perhaps debatable, but what is not
debatable is that it is not the role of this Court to pronounce the Second Amendment
extinct." *Heller I*, 554 U.S. at 636. In this case, this court is called upon to review
the constitutionality of Section (b)(3)(iii) of the Chicago Firearm Ordinance,
applying *Heller I* and other precedential decisions, including decisions that followed
*Heller I*.


C. Proper Approach in Analyzing the Constitutionality of the Ordinance

This court must first determine the proper approach in reviewing the challenge
to Section (b)(3)(iii) of the Chicago Firearm Ordinance. The Supreme Court
indicated in *Heller I* that the core right under the Second Amendment to possess a
firearm in one's own home for self-defense is not absolute, and it can be restricted as
to certain individuals, such as felons. *Heller I*, 554 U.S. at 626-27. The issue is
whether the text, history, and tradition of the Second Amendment should control in
reviewing Section (b)(3)(iii) of the Chicago Firearm Ordinance, which takes away a
core constitutional right, or whether the court should apply a balancing test such as

strict scrutiny or even intermediate scrutiny.[2]

As indicated above, in *Heller I*, the Supreme Court addressed the scope of Second Amendment constitutional protections in the context of analyzing the constitutionality of a handgun ban. The Court in *Heller I* held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller I*, 554 U.S. at 592. The Court in *Heller I* arrived at its holding after examining "the historical background of the Second Amendment." *Id.* The Court explained that "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Id.* (emphasis original). The Court in *Heller I* also concluded based upon "both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.* at 595. The Court in *Heller I* also specifically recognized that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635; *see also McDonald*, 130 S.Ct. at 3044 (indicating that the "central holding" in *Heller I* was "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home").

This "inherent right of self-defense" articulated by the Court in *Heller I,* which

---

[2] This court notes that some Circuits have used different approaches when addressing Second Amendment claims. For example, the Fourth Circuit has applied a sliding scale approach, and has applied a level of scrutiny based on the context of the restriction upon Second Amendment rights. *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011). The Second Circuit has required a showing that the regulation "operate[s] as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)," before a heightened scrutiny is triggered. *United States v. Decastro*, 2012 WL 1959072, at *5 (2nd Cir. 2012).

is central to the Second Amendment right of citizens, is also articulated by Justice

Alito in his majority opinion in *McDonald*, stating that individual "[s]elf-defense is a

basic right . . . that is the central component of the Second Amendment right," and

that "this right is deeply rooted in this Nation's history and tradition."[3]  *McDonald*,

130 S.Ct. at 3036 (internal quotations omitted); *see also Ezell v. City of Chicago*, 651

F.3d 684, 704 (7th Cir. 2011)(recognizing the Supreme Court's holding that the

"'central component' of the Second Amendment is the right to keep and bear arms

for defense of self, family, and home").  In addition, in the concurring opinion in

*McDonald*, Justice Scalia explained the value of a text, history, and tradition

approach, stating that unlike the conventional balancing tests "it is much less

subjective, and intrudes much less upon the democratic process."  *McDonald*, 130

S.Ct. at 3058.

    In addition, in *Heller I,* the Court did not indicate which of the "traditionally

expressed" levels of scrutiny, if any, should be applied to Second Amendment

restrictions, but explicitly rejected a "judge empowering 'interest-balancing

inquiry.'"  *Heller I*, 554 at 628-29, 634-35.  In so doing, the Court observed that

"[c]onstitutional rights are enshrined with the scope they were understood to have

when the people adopted them, whether or not future legislatures or (yes) even future

---

[3] Although the Second Amendment does not specifically reference the right to personal self-defense, it was a right
that was commonly understood to be a natural right at the time of the ratification of the Second Amendment. *See,
e.g.,* Thomas Jefferson, Legal Commonplace Book (stating that "Laws that forbid the carrying of arms . . . disarm
only those who are neither inclined nor determined to commit crimes . . . ; Such laws make things worse for the
assaulted and better for the assailants.")(quoting 18th century criminologist Cesare Beccaria).  John Adams
specifically referenced self-defense, stating that "Arms in the hands of citizens [may] be used at individual discretion
. . . in private self defense."

judges think that scope too broad." *Id.* at 634-35. The Court also advised that there would be "time enough to expound upon the historical justifications for the exceptions [to the right to keep and bear arms that the Court] . . . mentioned if and when those exceptions c[a]me before [the Court]." *Id.* at 635.

After the Supreme Court's analyses in *Heller I* and *McDonald*, Judge Kavanaugh, in *Heller v. Dist. of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011)(*Heller II*) opined in extensive detail that, based upon *Heller I* and *McDonald*, there is "little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting); *see also United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010)(recognizing "the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings")(citing *United States v. Bloom,* 149 F.3d 649, 653 (7th Cir. 1998)).

The City of Chicago has pointed to certain studies to justify Section (b)(3)(iii) of the Chicago Firearm Ordinance. However, pointing to certain studies as a justification to restrict a core constitutional right creates exactly the type of problem identified by Justice Scalia in *Heller I*, since when reviewing the constitutionality of an ordinance under a balancing test, as opposed to under a text, history, and tradition approach, for every study, there can be a credible or convincing rebuttal study. For example, the amicus brief submitted by the Illinois State Rifle Association has pointed to different credible studies and statistics than those relied on by the City of

Chicago. As Justice Scalia explained in *McDonald*, a text, history, and tradition approach "is less subjective because it depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *McDonald*, 130 S.Ct. at 3058. Thus, this court concludes that the constitutionality of Section (b)(3)(iii) of the Chicago Firearm Ordinance should be analyzed under a text, history, and tradition approach. In addition, as discussed in more detail below, even under a balancing test,[4] and more specifically, under a strict scrutiny test, or even an intermediate scrutiny test, Section (b)(3)(iii) of the Chicago Firearm Ordinance does not pass constitutional muster.


1. Text, History, and Tradition Analysis

Under a text, history, and tradition analysis, the court must assess whether "a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868 . . . ." *Ezell*, 651 F.3d at 702-03; *see also Heller I*, 554 U.S. at 576 (stating that the Court is "guided by the principle that "[t]he Constitution was written to be

---

[4]The court notes in regard to the rational-basis test that the Supreme Court has indicated that excluding individuals from exercising their Second Amendment rights requires a substantial showing, not merely a rational connection between the law and the stated objective. *Heller*, 554 U.S. at 629 n.27 (stating that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect"). The Seventh Circuit in *Skoien*, 614 F.3d 638 (7th Cir. 2010), citing *Heller I*, stated that a categorical limit on the possession of firearms analyzed under a rational-based test, "which deems a law valid if any justification for it may be imagined," would not be appropriate, since "if a rational basis were enough, the Second Amendment would not do anything . . . because a rational basis is essential for legislation in general." *Id.* at 641.

understood by the voters; its words and phrases were used in their normal and
ordinary as distinguished from technical meaning" and that "[n]ormal meaning may
of course include an idiomatic meaning, but it excludes secret or technical meanings
that would not have been known to ordinary citizens in the founding generation")
(internal quotation omitted)(quoting in part *United States v. Sprague,* 282 U.S. 716,
731 (1931)). In other words, "when state or local government action is challenged,
the focus of the original-meaning inquiry is carried forward in time; the Second
Amendment scope as a limitation on the States depends on how the right was
understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.
With respect to the time period during which the Bill of Rights was drafted and
ratified, the Court in *Heller I* confirmed the "historical reality that the Second
Amendment was not intended to lay down a novel principl[e] but rather codified a
right inherited from our English ancestors . . . ." *Heller I*, 554 U.S. at 599 (internal
quotations omitted)(quoting *Robertson v. Baldwin,* 165 U.S. 275, 281 (1897)). The
Court in *Heller I* also rejected the argument that "only those arms in existence in the
18th century are protected by the Second Amendment" and held that the "Second
Amendment extends, prima facie, to all instruments that constitute bearable arms,
even those that were not in existence at the time of the founding." *Heller I*, 554 U.S.
at 582. With respect to the time period leading up to and during which the
Fourteenth Amendment was drafted and ratified, the Court in *McDonald* indicated
that "[b]y the 1850's, the perceived threat that had prompted the inclusion of the
Second Amendment in the Bill of Rights—the fear that the National Government

would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense." *McDonald*, 130 S.Ct. at 3038.  After providing a lengthy historical discussion, the Court concluded that "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 3042.

Gowder argues that Section (b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutional based upon the text, history, and tradition surrounding the Second Amendment.  In applying a text, history, and tradition analysis to the ordinance in question, the Seventh Circuit's decision in *Skoien* is instructive with regard to Second Amendment restrictions upon violent versus non-violent individuals.  In *Skoien*, the Seventh Circuit addressed the constitutionality of a statute that limits certain individuals who have engaged in violent conduct from exercising their rights under the Second Amendment, and held that a federal statute barring individuals from the possession of firearms based on a misdemeanor conviction of domestic violence was not unconstitutional.[5]  *Skoien,* 614 F.3d at 641-42.  While the facts in *Skoien* are distinguishable from the facts of this case, since both *Skoien* and the instant case relate to misdemeanants, the Seventh Circuit's holding in *Skoien* is valuable to shed light on the historical difference between violent and non-violent misdemeanants, and whether a non-violent misdemeanant's Second Amendment

---

[5] 18 U.S.C. § 922(g)(9) disqualifies those convicted of a "misdemeanor crime of domestic violence" from carrying firearms in or affecting interstate commerce.

constitutional right can be taken away based upon the text, history, and tradition of the Second Amendment.[6]

In *Skoien*, the Seventh Circuit focused on the fact that Congress passed 18 U.S.C. § 922(g)(9) because the nature of domestic violence crimes pointed to the fact that "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies." *Id.* (stating that "Congress 'sought to close this dangerous loophole' with § 922(g)(9)"). *Id.* at 643. The court in *Skoien* explained three factors that support the notion that a ban on misdemeanants convicted of domestic violence can be analogized to a ban on felons: (1) "that domestic abusers often commit acts that would be charged as felonies if the victim was a stranger, but that are misdemeanors because the victim is a relative (implying that the perpetrators are as dangerous as felons)," (2) "that firearms are deadly in domestic strife," and (3) "that persons convicted of domestic violence are likely to offend again, so that keeping the most lethal weapon out of their hands is vital to the safety of their relatives." *Id.* (stating that "[d]ata support all three of these propositions"); *see also United States v. Yancey*, 621 F.3d 681, 683-84, 686 (7th Cir. 2010)(recognizing the "connection between drug use and violent crime," and holding that prohibiting firearm possession by unlawful users of any controlled substance or those addicted to any controlled substance helps meet the broad goal of minimizing armed violence and keeping firearms "out of the hands of presumptively 'risky

---

[6] In *Heller I*, the Supreme Court indicated that its ruling did not extend to prohibitions on the possession of firearms by felons and that issue is not before this court in this case. 554 U.S. at 626.

people'"").

In addition, the Seventh Circuit in *Skoien* pointed out that "violence (actual or attempted) is an element" of the crime of domestic violence; "it is not enough that a risky act happens to cause injury." *Skoien,* 614 F.3d at 642. The Seventh Circuit in *Skoien* also found that domestic violence crimes depend heavily on the identity of the victim and his/her relationship with the offender. *Id.* For example, if a perpetrator in a domestic violence case was a stranger to the victim, he would be charged as a felon. *Id.* at 643. However, in order to get a family member to cooperate in a domestic violence case, prosecutors opt to charge the alleged offender with a misdemeanor rather than a felony. *Id.* Thus, someone convicted for a domestic violence misdemeanor is analogous to a felon, a category of individuals who traditionally are prohibited from obtaining a firearm. Additionally, the recidivism rate for individuals convicted of domestic violence is very high, further justifying imposing Second Amendment restrictions on such individuals in the interest of public safety. *Id.* at 644. Based on such considerations, restricting the Second Amendment rights of individuals convicted of crimes of violence, whether felony or misdemeanor, has been found to be constitutional.

As indicated previously, Section (b)(3)(iii) of the Chicago Firearm Ordinance contains vague language as to the term "unlawful use of a weapon." Chicago Municipal Code 8-20-110(b)(3)(iii). The term "unlawful use of a weapon," as contained in Section (b)(3)(iii) of the Chicago Firearm Ordinance, does not

necessarily implicate any violent or dangerous act, since a person can be convicted in

certain jurisdictions of the offense of "unlawful use of a weapon" for merely

possessing a firearm without any violence associated with it.  In contrast, as

discussed above, a misdemeanor crime of domestic violence does directly implicate a

violent and dangerous act.  Also, unlike the phrase "unlawful use of a weapon" at

issue in the instant action, the phrase "misdemeanor crime of domestic violence"

addressed in *Skoien* was defined by the statute at issue itself.  The phrase

"misdemeanor crime of domestic violence" was specifically defined, in part, as an

offense having "as an element, the use or attempted use of physical force, or the

threatened use of a deadly weapon . . . ."  *Skoien*, 614 F.3d at 642 (citing 18 U.S.C. §

921(a)(33)).

   In contrast to the plaintiff in *Skoien*, the plaintiff in the instant action does not

fit the description of the type of individuals from which Congress sought to protect

the public.  Gowder was convicted of a misdemeanor crime that involved no violence

or direct threat to the safety of the public.  A non-violent misdemeanant, such as

Gowder, stands apart from the risky or violent misdemeanants, like those plaintiffs in

*Skoien* or *Yancey*, in that there is not evidence in this case showing that Gowder falls

into the category of a risky person or embodies the type of violent citizen falling

outside the group of individuals entitled to exercise their constitutional right to bear

arms under the Second Amendment.  The element of violence is a distinguishing

factor between a domestic violence misdemeanor offense and a misdemeanor offense

for merely possessing a weapon.

In other words, Section (b)(3)(iii) of the Chicago Firearm Ordinance does not differentiate between those who have been convicted of a felony or a misdemeanor, or between those who have been convicted of a violent or non-violent crime, and thus the denial of a Chicago Firearm Permit to Gowder does not find a valid foothold in statutory history. To the contrary, Section (b)(3)(iii) of the Chicago Firearm Ordinance lumps together non-violent misdemeanants, violent misdemeanants, and felons. While the Supreme Court has historically allowed prohibitions as to certain individuals, including felons and those convicted of violent crimes, at the time the Second Amendment was passed and at the time the Fourteenth Amendment was ratified, it was not intended to apply to non-violent misdemeanants, nor has this group of individuals traditionally been barred from exercising their inherent Second Amendment rights.

The effect of Section (b)(3)(iii) of the Chicago Firearm Ordinance is to forever strip certain persons residing in Chicago of their constitutional right to protect themselves in their own homes, including, for example, a person convicted forty years ago of simply possessing a firearm (and not unlawfully using it against another). The Chicago Firearm Ordinance regulates a person's core Second Amendment right to possess a gun for self-defense by requiring that person to obtain a Chicago Firearm Permit before he can possess a firearm in his own home. This is not a case where a person is applying for a Chicago Firearm Permit in order to carry

a firearm in public.  This is a case where a person is required by the City of Chicago

to apply for a Chicago Firearm Permit in order to legally possess a firearm at home

for self-defense, which is a core Second Amendment constitutional right.  There is

something incongruent about a non-violent person, who is not a felon, but who is

convicted of a misdemeanor offense of simple possession of a firearm, being forever

barred from exercising his constitutional right to defend himself in his own home in

Chicago against felons or violent criminals.  The same Constitution that protects

people's right to bear arms prohibits this type of indiscriminate and arbitrary

governmental regulation.  It is the opinion of this court that any attempt to dilute or

restrict a core constitutional right with justifications that do not have a basis in

history and tradition is inherently suspect.  Section (b)(3)(iii) of the Chicago Firearm

Ordinance, lacking textual, historical, or traditional justification, infringes upon a

core right afforded by the Second Amendment.  Therefore, under a text, history, and

tradition analysis, Section (b)(3)(iii) of the Chicago Firearm Ordinance violates

Gowder's Second Amendment Constitutional right.


2.  Strict Scrutiny Test

This court has found that the text, history, and tradition approach is the proper

approach in analyzing the constitutionality of Section (b)(3)(iii) of the Chicago

Firearm Ordinance.  However, if a text, history, and tradition analysis was found not

to be the appropriate approach, then based upon the discussions regarding Second

Amendment rights by Justice Scalia in *Heller I* and *McDonald* and by Judge Kavanaugh in *Heller II*, this court finds that the strict scrutiny balancing test would be the most appropriate test to apply in the instant case, since "the right to possess guns is a core enumerated constitutional right" and Section (b)(3)(iii) of the Chicago Firearm Ordinance completely restricts that right. *Heller II*, 670 F.3d at 1284 (Kavanaugh, dissenting); *see also Ezell*, 651 F.3d at 703 (stating that "laws imposing severe burdens get strict scrutiny"). Both *Heller I* and *McDonald* confirm that the right to keep and bear arms is a fundamental right under the Constitution. *Heller I*, 554 U.S. at 593-94; *McDonald*, 130 S.Ct. at 3036. It is also well-established that the strict scrutiny test is generally "applied when government action impinges upon a fundamental right protected by the Constitution." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983); *see also Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003)(stating that "[i]t is well established that when a fundamental constitutional right is at stake, courts are to employ the exacting strict scrutiny test").

In *Ezell*, which is controlling precedent for this court, the Seventh Circuit reviewed the constitutionality of a local ordinance that prohibited firing ranges within the City of Chicago. *Ezell*, 651 F.3d at 689-90. At the time *Ezell* was decided, the City of Chicago had a prerequisite of firing range training before people could exercise their core constitutional right to possess guns in their own home for self-defense, and the City of Chicago had, at the same time, prohibited firing ranges within the city limits. *Id.* In reviewing the City of Chicago's firing range ban, the

24

Seventh Circuit indicated that the ban was "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id*. at 708. The Seventh Circuit further indicated that "the City['s] condition[ing] [of] gun possession on range training is an additional reason to closely scrutinize the range ban." *Id*. Based on such factors, the Seventh Circuit indicated that "a more rigorous showing than that applied in *Skoien* [(intermediate scrutiny)] should be required, if not quite 'strict scrutiny.'" *Id*. According to the Seventh Circuit in *Ezell*, intermediate scrutiny would only apply to "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right" to bear arms. *Id*. Thus, in *Ezell*, the Seventh Circuit stated that "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Id*. The Seventh Circuit concluded in *Ezell* that the City of Chicago had not shown an extremely strong public-interest justification or a close fit between the government's means and its ends, and thus granted the plaintiffs' request for a preliminary injunction.

In the case before this court, Section (b)(3)(iii) of the Chicago Firearm Ordinance directly restricts the core Second Amendment right of armed self-defense in one's home. If a regulation restricting a corollary to this core Second Amendment right is subject to a more heightened level of scrutiny than intermediate scrutiny,

even if not quite strict scrutiny, then a regulation restricting the core Second Amendment right to keep arms for self-defense within the home, such as Section (b)(3)(iii) of the Chicago Firearm Ordinance, must be reviewed under a text, history, or tradition approach, or at least under strict scrutiny, as discussed above. In the instant case, unlike in *Ezell*, the ordinance in question completely and directly bars certain citizens, including non-violent misdemeanants, from exercising their Second Amendment right to protect themselves in their homes. Under Section (b)(3)(iii) of the Chicago Firearm Ordinance, any individual who has ever been convicted of a misdemeanor of simple possession of a gun is forever barred from possessing a gun in his own home for self-defense because his Chicago Firearm Permit Application, which is a prerequisite to possessing a firearm in the home, will necessarily be denied under Section(b)(3)(iii) of the Chicago Firearm Ordinance. Thus, as compared to the regulation at issue in *Ezell*, Section (b)(3)(iii) of the Chicago Firearm Ordinance is much closer to the type of "absolute prohibition of handguns held and used for self-defense in the home," which was found unconstitutional in *Heller I*. *Heller I*, 554 U.S. at 636. Therefore, a strict scrutiny test would be the most appropriate in reviewing the constitutionality of Section (b)(3)(iii) of the Chicago Firearm Ordinance.

Under a strict scrutiny test, "the law [at issue] must be narrowly tailored to serve a compelling governmental interest." *Ezell*, 651 F.3d at 707. While the stated purpose of Chicago's gun regulations is "protecting the public from the potentially

deadly consequences of gun violence," strict scrutiny requires the City of Chicago to show that Section (b)(3)(iii) of the Chicago Firearm Ordinance is narrowly tailored to serve a compelling governmental interest. (R SAF Par. 1); *Ezell*, 651 F.3d at 707. The City of Chicago argues that the City of Chicago has a high murder and non-negligent manslaughter rate relating to gun violence. Even though the City of Chicago provides some general data and studies, the City of Chicago fails to provide a sufficiently detailed and proper analysis specifically addressing non-violent misdemeanants, such as Gowder. While this court does not question the good faith intentions of the City of Chicago to curtail gun violence, the City of Chicago has not shown that Section (b)(3)(iii) of the Chicago Firearm Ordinance is the least restrictive means to do so. Therefore, based upon the above, this court finds Section (b)(3)(iii) of the Chicago Firearm Ordinance to be unconstitutional under a strict scrutiny test.

### 3. Intermediate Scrutiny Test

Under an intermediate scrutiny test, regulations concerning Second Amendment rights are valid only if they are "substantially related to an important government objective." *Skoien*, 614 F.3d at 641. To satisfy an intermediate scrutiny test, the government's "showing must be strong." *Skoien* 614 F.3d at 641; *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 426, 438 (2002)(stating that the government cannot "get away with shoddy data or reasoning"). This court

recognizes that some courts have applied an intermediate scrutiny test with regard to

certain statutes and regulations restricting firearms possession by individuals who

pose a risk of violence.[7]  For the same reasons discussed above relating to strict

scrutiny, and under *Ezell*, an intermediate scrutiny test would not be appropriate in

reviewing Section (b)(3)(iii) of the Chicago Firearm Ordinance.

However, even under an intermediate scrutiny test, which this court does not

find to be the proper test in analyzing the constitutionality of Section (b)(3)(iii) of the

Chicago Firearm Ordinance, the City of Chicago has not pointed to sufficiently

detailed evidence to show an increased likelihood of future gun violence by those

convicted of non-violent misdemeanor firearm offenses.  (SAF Ex. 6).  The evidence

presented by the City of Chicago does not rise to the level of evidence presented in

*Skoien* about predispositions to violence.  In addition, the evidence presented by the

City of Chicago does not properly make a distinction between misdemeanants

convicted of firearm violations that involve violence and misdemeanants convicted

of firearm violations that do not involve violence, such as those convicted for mere

possession.  Nor is there any indication that Section (b)(3)(iii) of the Chicago

Firearm Ordinance is somehow closing a dangerous loophole where non-violent

misdemeanants, like Gowder, would otherwise be convicted of felonies but for some

---

[7]For example, in *United States v. Chester*, 628 F.3d 673, 678 (4th Cir. 2010), the Fourth Circuit reviewed the constitutionality of 18 U.S.C. § 922(g)(9), which bans possession of a firearm by those convicted of a misdemeanor crime of domestic violence, and in *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010), the Tenth Circuit reviewed the constitutionality of 18 U.S.C. §922(g)(8), which bans possession of a firearm by those subject to a domestic protection order.  *Chester*, 628 F.3d at 678; *Reese*, 627 F.3d at 802.  *Chester* and *Reese* both addressed the constitutionality of federal statutes that applied to violent criminals, and in each case, the circuit courts applied an intermediate scrutiny test.

unique aspect of the offense. Additionally, as discussed above, violence, physical force, or the threatened use of a deadly weapon are not necessarily components of a misdemeanor conviction for unlawful use of a weapon. In fact, Municipal Code of Chicago Section 8-20-110(b)(3)(i), as opposed to Section 8-20-110(b)(3)(iii), separately bars a person convicted of "a violent crime" from receiving a Chicago Firearm Permit, thus barring such a person from exercising his constitutional right under the Second Amendment. Municipal Code of Chicago Section 8-20-110(b)(3)(i). Even one of the studies relied upon by the City of Chicago indicates that those convicted of misdemeanors *involving violence* are at greatest risk for committing future violent offenses. (SAF Ex. 6). Based on the record before this court, the City of Chicago has not made a strong showing under an intermediate scrutiny test that Section (b)(3)(iii) is substantially related to an important government objective.

Due to the significant lack of evidence indicating that a non-violent misdemeanant, like Gowder, poses a risk to society analogous to that of a felon or a violent misdemeanant, Section (b)(3)(iii) of the Chicago Firearm Ordinance violates Gowder's constitutional rights under the Second Amendment under an intermediate scrutiny test. Although this court has found that the intermediate scrutiny test is not the proper test to apply in reviewing the constitutionality of Section (b)(3)(iii) of the Chicago Firearm Ordinance, this court finds that Section (b)(3)(iii) of the Chicago Firearm Ordinance does not pass constitutional muster even under an intermediate

scrutiny test. Based on the above, the court grants Gowder's motion for summary judgment on Count II.

## CONCLUSION

Based on the foregoing analysis, Gowder's motion for summary judgment is granted and the court finds that Section (b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutionally void for vagueness and is unconstitutional for violating Gowder's Second Amendment constitutional right to keep and bear arms. As to Gowder's request for injunctive relief, the City of Chicago is barred from denying Gowder's application for a Chicago Firearm Permit based upon his misdemeanor conviction that is the subject of this action. In light of this court's holding that Section (b)(3)(iii) of the Chicago Firearm Ordinance is unconstitutional under the Second Amendment of the United States Constitution, Gowder's claims in Counts I and III are stricken as moot.

Samuel Der-Yeghiayan

Samuel Der-Yeghiayan
United States District Court Judge

Dated: June 19, 2012